**MAGNOLIA BAR ASSOCIATION, INC., Mississippi State Conference of the National Association for the Advancement of Colored People, Rainbow Coalition, Mississippi Association of Black Supervisors, Mississippi Conference of Black Mayors, George Flaggs, Bennie Thompson, Sheila Johnson, and Sam McCray, on Behalf of Themselves and all others similarly situated, Plaintiffs,**

v.

**Roy Noble LEE, Dan M. Lee, Armis E. Hawkins, Lenore L. Prather, James L. Robertson, Michael D. Sullivan, Fred L. Banks, Jr., Chuck R. McRae, and Edwin Lloyd Pittman, Justices of the Supreme Court of the State of Mississippi;**

---

Mike Moore, Attorney General of the State of Mississippi, Ray Mabus, Governor of the State of Mississippi, Dick Molpus, Secretary of State of the State of Mississippi, Members of the State Board of Election Commissioners; the Mississippi Republican Party Executive Committee; and the Mississippi Democratic Party Executive Committee, Defendants.

Civ. A. No. J90–0413(B).

United States District Court,
S.D. Mississippi,
Jackson Division.

July 15, 1992.

Carroll Rhodes, Hazlehurst, Miss., Margaret Carey, Wanda Turner–Lee, Greenville, Miss., Deborah A. McDonald, Natchez, Miss., for plaintiffs.

Giles W. Bryant, Robert E. Sanders, Asst. Attys. Gen., Jackson, Miss., for Justices, Mabus, Moore and Molpus.

### TABLE OF CONTENTS

I. Preliminary Facts and Legal Background ..................................1391
 A. Procedural History ...............................................1391
 B. Factual Background ...............................................1391
 1. The Supreme Court of the State of Mississippi ...................1391
 a. Nature, Functions and Duties ................................1391
 b. Supreme Court Elections .....................................1392
 c. Population Within the Three Supreme Court Districts..........1393
 d. Black Supreme Court Justices ................................1393
 C. Legal Background..................................................1393
 1. Section 2 of the Voting Rights Act of 1965 ......................1393
 2. Application of Section 2 to Judicial Elections ...................1394
 3. Standard for Proving a Section 2 Violation ......................1395
 a. *Thornburg* Tripartite Test..................................1396
 (1) Sufficiently Large and Geographically Compact Minority Group Population ..........................................1396
 (2) Political Cohesion in the Minority Group Population ........1398
 (3) Bloc Voting in the White Majority Population..............1399
 b. Totality of the Circumstances ...............................1400

II. Findings of Fact and Conclusions of Law .................................1401
 A. At-large, Multimember District Challenge .........................1401
 1. District Two: The Southern District .............................1401
 a. *Thornburg* Tripartite Test..................................1402
 (1) Sufficiently Large and Geographically Compact Black Population .................................................1402
 2. District Three: The Northern District............................1402
 a. *Thornburg* Tripartite Test..................................1402
 (1) Sufficiently Large and Geographically Compact Black Population .................................................1402
 3. District One: The Central District ..............................1403
 a. *Thornburg* Tripartite Test..................................1403
 (1) Sufficiently Large and Geographically Compact Black Population .................................................1403
 (2) Political Cohesion in the Black Population .................1404
 (3) Bloc Voting in the White Majority Population..............1405
 b. Totality of the Circumstances ...............................1407
 (1) History of Official Discrimination .........................1408
 (2) Racially Polarized Voting .................................1408
 (3) Unusually Large Districts, Majority Vote Requirements, Anti–Single–Shot Provisions, or Other Discriminatory Voting Practices or Procedures .............................1408
 (4) Candidate Slating Process .................................1409
 (5) Socioeconomic Effects of Discrimination ..................1409

 (6) Racial Appeals in Political Campaigns ...................... 1409
 (7) Minority Electoral Success ................................. 1410
 (8) Lack of Responsiveness to the Particularized Needs of Blacks.. 1410
 (9) Tenuousness of State Policies Underlying Multimember, At-Large Districts ......................................... 1410
 B. District Line Challenge ...................................... 1412
 1. Three North–South Districts Without Splitting Counties ............ 1414
 a. *Thornburg* Tripartite Test...................................... 1415
 (1) Sufficiently Large and Geographically Compact Black Population ......................................... 1415
 2. Subdistricts Within the Proposed North–South Districts ........... 1415
 a. *Thornburg* Tripartite Test...................................... 1415
 (1) Sufficiently Large and Geographically Compact Black Population ......................................... 1415
 (2) Political Cohesion in the Black Population ................... 1416
 (3) Bloc Voting in the White Majority Population............... 1416
 b. Totality of the Circumstances ................................... 1416
 (1) Tenuousness of State Policies Underlying Existing Supreme Court Lines ......................................... 1417

III. Conclusion ..................................................... 1418

---

## MEMORANDUM OPINION AND ORDER

BARBOUR, Chief Judge.

This action is a challenge by Plaintiffs under section 2 et seq. of the Voting Rights Act of 1965, 42 U.S.C. § 1973 et seq., to the system of electing justices to the Supreme Court of the State of Mississippi. Plaintiffs are the Magnolia Bar Association, Inc., a predominately black bar organization incorporated under the laws of the State of Mississippi; the Mississippi State Conference of the National Association for the Advancement of Colored People, a civil rights organization; the Rainbow Coalition, a civil rights organization; the Mississippi Association of Black Supervisors, an organization of black elected county supervisors; the Mississippi Conference of Black Mayors, an organization of black elected mayors; George Flaggs, an adult black citizen and registered voter in Warren County, Mississippi; Bennie Thompson, an adult black citizen and registered voter in Hinds County, Mississippi; Sheila Johnson, an adult black citizen and registered voter

in Adams County, Mississippi; and Sam McCray, an adult black citizen and registered voter in Quitman County, Mississippi. Defendants are the justices of the Supreme Court of the State of Mississippi; Ray Mabus, the Governor of the State of Mississippi,[1] Mike Moore, the Attorney General of the State of Mississippi, and Dick Molpus, the Secretary of State of the State of Mississippi, the members of the Mississippi State Election Commission; the Mississippi Republican Party Executive Committee;[2] and the Mississippi Democratic Party Executive Committee.

Plaintiffs make two distinct challenges in contending that the present supreme court electoral system impermissibly dilutes black voting strength in violation of section 2. First, Plaintiffs challenge the at-large, multimember, numbered post and staggered term features of supreme court elections. These features, Plaintiffs contend, dilute black voting strength by subsuming insular black geographical areas into larger majority white voting districts and spacing elections so blacks cannot marshal their most effective electoral effort.

---

[1] Ray Mabus is no longer the Governor of the State of Mississippi, but the parties have not entered a formal order of substitution.

[2] The Mississippi Republican Party Executive Committee was relieved from further pleadings and appearances as a Defendant in this action pursuant to a Consent Order on September 10, 1990.

Second, Plaintiffs challenge the east-west district lines which divide the State of Mississippi into three supreme court districts. Plaintiffs contend that the east-west configuration of these lines dilutes black voting strength by dividing the heavily black populated areas on the western side of the state into each of three majority white districts.

A trial was held from February 25, 1992, through February 27, 1992. The Court in making its rulings considers the evidence presented at trial and the evidence received at the hearing on the Motion for Preliminary Injunction held on October 18, 1991.

## I. Preliminary Facts and Legal Background

### A. Procedural History

In their Complaint, Plaintiffs asserted claims pursuant to section 2 and section 5 of the Voting Rights Act, the fourteenth and fifteenth amendments of the United States Constitution, and Mississippi state law. On September 24, 1991, a three-judge panel constituted to hear Plaintiffs' section 5 claim granted Defendants' Motion for Partial Summary Judgment on that claim.[3] By pretrial order on February 14, 1992, Plaintiffs voluntarily dismissed all claims except their claims pursuant to section 2.

On October 18, 1991, after a hearing, the Court denied Plaintiffs' Motion for a Preliminary Injunction enjoining the general election for Mississippi Supreme Court Central District, Place No. 2, scheduled for November 5, 1991, and all future elections.

### B. Factual Background

#### 1. The Supreme Court of the State of Mississippi

##### a. Nature, Functions and Duties

The Supreme Court of the State of Mississippi is established by the Mississippi Constitution and is the appellate court of last resort in the state.[4] The Mississippi Constitution provides as follows:

Section 144. The judicial power of the state shall be vested in a Supreme Court and such other courts as are provided for in this constitution.

Miss. Const. art. 6, § 144.

Nine justices comprise the Supreme Court of Mississippi, any five of whom when convened constitute a quorum. *Id.* art. 6, § 145B. The supreme court is a court of general appellate jurisdiction and hears both criminal and civil appeals from the twenty circuit courts and twenty chancery courts in the State. Miss.Code Ann. § 9-3-9 (1972).

The supreme court justice who has served for the "longest time continuously" is the Chief Justice. Miss.Code Ann. § 9-3-11 (1972). The Chief Justice is the administrative head of the Court. The two justices who have served continuously for the next longest time periods are the Senior and Junior Presiding Justices. *Id.* The Court ordinarily decides cases by panels of three. The Chief Justice, Senior Presiding Justice and Junior Presiding Justice preside over the three-justice panels. The composition of these panels varies and is not based upon the three electoral districts. Cases are assigned on a random basis so that individual justices decide cases which originated both within and without their electoral districts.

Supreme court justices must meet certain age, residence and professional criteria, as provided by the Mississippi Constitution.

No personal [sic] shall be eligible to the office of judge of the Supreme Court

---

**3.** The section 5 claim did not involve the matters addressed herein. It challenged the creation and implementation of three new appointed positions of Mississippi Supreme Court Magistrates as authorized by Miss.Code Ann. § 9-3-47, (1972), formerly Chapter 363, H.B. 838, Laws of 1990. Three magistrates, all white, had been appointed by the supreme court. Plaintiffs claimed that the magistrates had judicial functions, that Miss.Code Ann. § 9-3-47, (1972),

formerly Chapter 363, H.B. 838, Laws of 1990, had not been precleared as required by the Voting Rights Act, and, therefore, there had been a section 5 violation. The section 5 challenge was originally the primary emphasis of Plaintiffs' lawsuit.

**4.** There is no intermediate court of appeals in the judicial system of the State of Mississippi.

who shall not have attained the age of thirty years at the time of his appointment, and who shall not have been a practicing attorney and a citizen of the state for five years immediately preceding such appointment.

Miss. Const. art. 6, § 150.

### b. Supreme Court Elections

It is the manner in which Mississippi elects its supreme court justices, however, rather than the actual functions of the supreme court, that forms the crux of the present action. Article 6, Section 145 of the Mississippi Constitution provides in pertinent part as follows:

The legislature shall divide the state into three Supreme Court districts, and there shall be elected one judge for and from each district by the qualified electors thereof at a time and in the manner provided by law.[5]

Miss. Const. art. 6, § 145. The Mississippi Constitution was subsequently amended to provide for six justices, *id.* art. 6, § 145A, and then was finally amended to provide for nine justices, which is the number presently on the Court. *Id.* art. 6, § 145B. Every amendment to the number of justices sitting on the supreme court retained the electoral component. Section 145B now provides in pertinent part as follows:

The Supreme Court shall consist of nine judges.... The additional judges herein provided for shall be selected one for and from each of the supreme court districts

in the manner provided for by Section 145A of this Constitution or any amendment thereto.

*Id.* art. 6, § 145B.

The term of office for justices of the Mississippi Supreme Court is eight years. *Id.* art. 6, § 149. Candidates for the supreme court are nominated and elected by party affiliation,[6] with elections to be held concurrently with the election of representatives to Congress.[7] Three justices are elected from each of the three districts. District Number Three, or the "Northern District," covers roughly the northern one-third of the state. District Number One, or the "Central District," covers roughly the middle one-third of the state. District Number Two, or the "Southern District," covers roughly the southern one-third of the state. Miss.Code Ann. § 9–3–1 (1972). Each supreme court justice is elected individually, as provided for by Miss.Code Ann. § 23–15–993 (1972), which states in pertinent part as follows:

For the purpose of all elections, including primary elections, each of the nine (9) judgeships shall be considered a separate office. The three (3) offices in each of the three (3) Supreme Court districts shall be designated Position Number 1, Position Number 2 and Position Number 3, and in qualifying for an office as a candidate for any office of judge of the Supreme Court each candidate shall state the position number of the office to

---

**5.** Note, however, that vacancies on the supreme court are filled, on an interim basis, by gubernatorial appointment. Miss.Code Ann. § 9–1–103 (1972). If the remainder of the unexpired term is more than nine months, a special election is called. Miss.Code Ann. § 23–15–849 (1972).

**6.** Miss.Code Ann. § 23–15–997 provides as follows:

Nominations for candidates for the office of judge of the Supreme Court by any political party shall be made by districts.... The general primary election laws shall apply to and govern the nomination of candidates for the office of judge of the Supreme Court insofar as they may be applicable.

**7.** Miss.Code Ann. § 23–15–991 provides in pertinent part as follows:

... Concurrently with the regular election for representatives in Congress, held next preceding the expiration of the term of an incum-

bent, and likewise each eighth year thereafter, an election shall be held in the Supreme Court district from which such incumbent was elected at which there shall be elected a successor to the incumbent, whose term of office shall thereafter begin on the first Monday in January of the year in which the term of the incumbent he succeeds expires.

Miss.Code Ann. § 23–15–997 also provides in pertinent part as follows:

... [T]he primary elections for that purpose shall be held concurrently with the primary elections for the nomination of Representative in Congress, except as may be herein otherwise provided. The general primary election laws shall apply to and govern the nomination of candidates for the office of judge of the Supreme Court insofar as they may be applicable.

which he aspires and both the primary and regular election ballots shall so indicate.

Miss.Code Ann. § 23–15–993 (1972). Justices within a district, therefore, do not run for office against each other.

In sum, the Mississippi Supreme Court is comprised of nine justices elected, by party affiliation, to numbered posts for staggered eight-year terms on an at-large basis from three separate multimember districts.

### c. Population Within the Three Supreme Court Districts

Plaintiffs in the present action contend that the existing supreme court districts impermissibly dilute black voting strength. Table 1 summarizes 1990 population statistics in the three supreme court districts.

**TABLE 1**

| DISTRICT | Total Pop. | Black Pop. | Black Pop. % | Total *VAP | Black *VAP | Black *VAP % |
|---|---|---|---|---|---|---|
| District 3 (Northern) | 815,365 | 264,978 | 32.50% | 583,931 | 166,367 | 28.49% |
| District 1 (Central) | 887,966 | 414,478 | 46.68% | 623,064 | 263,205 | 42.24% |
| District 2 (Southern) | 869,885 | 235,601 | 27.08% | 619,462 | 148,097 | 23.91% |

(*—Voting Age Population)

### d. Black Supreme Court Justices

Two blacks, former Justice Reuben V. Anderson and current Justice Fred L. Banks, Jr., have served on the Supreme Court of the State of Mississippi. Former Justice Anderson was appointed to fill a vacancy in Central District, Place No. 2 by former Governor William Allain in January 1985, thus becoming the first black justice of the Supreme Court of the State of Mississippi in the twentieth century. Justice Anderson was elected to a full term on the supreme court in 1986, and served on the court until he resigned on December 31, 1990. Justice Banks was appointed in January 1991 by former Governor Ray Mabus to fill the unexpired term of former Justice Anderson. Justice Banks was elected to a full term in November 1991. Justice Banks currently serves on the Supreme Court of the State of Mississippi.

## C. Legal Background

### 1. Section 2 of the Voting Rights Act of 1965

The Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973, was enacted to abolish discriminatory voting devices, such as poll taxes and literacy tests, that impeded the participation of black citizens in the political process.

Section 2 of the Voting Rights Act, as originally enacted, stated as follows:

No voting qualification or prerequisite to voting, or standard, or practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color.

79 Stat. 437.[8]

In *Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), the United States Supreme Court held that a violation of section 2 could not be proved absent a showing of intentional discrimination. In holding that the strictures of section 2 and the fifteenth amendment to the United States Constitution were coextensive, Justice Stewart, in his plurality opinion, stated that

[t]he Fifteenth Amendment does not entail the right to have Negro candidates elected.... That Amendment prohibits only purposefully discriminatory denial

---

**8.** Congress subsequently amended section 2 in 1975 to include non-English speaking United States citizens within the ambit of the Voting Rights Act. *See* 42 U.S.C. § 1973.

or abridgment by government of the freedom to vote "on account of race, color, or previous condition of servitude." *Id.* at 65, 100 S.Ct. at 1498, *quoting* U.S. Const. amend. XV.

In 1982, Congress abrogated the "intentional discrimination" requirement set forth in *Mobile,* and amended section 2 to allow a violation to be proved if a voting practice or procedure "results" in a denial of the right to vote. Section 2 now reads as follows:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2), as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in

this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973. As the Supreme Court recently noted, subsection (a) of section 2 adopts a "results" test which does not require proof of intentional discrimination, and subsection (b) indicates the manner in which the results test should be applied. *Chisom v. Roemer,* —— U.S. ——, ——, 111 S.Ct. 2354, 2364, 115 L.Ed.2d 348, 363 (1991).

### 2. Application of Section 2 to Judicial Elections

Plaintiffs in the present action, in two distinct challenges, contend that the method of electing supreme court justices in the State of Mississippi, including the district lines used to apportion voters in supreme court elections, violates section 2 of the Voting Rights Act.

This Court has held that section 2 applies to judicial elections. In *Martin v. Allain,* ("*Martin I*"), 658 F.Supp. 1183 (S.D.Miss. 1987), this Court held that the system of electing circuit, chancery, and county court judges in the State of Mississippi diluted black voting strength in violation of section 2. This Court subsequently held that single-member districts should be adopted to remedy the section 2 violations in certain judicial districts. *Martin v. Mabus,* ("*Martin II*"), 700 F.Supp. 327 (S.D.Miss.1988). It had previously been determined that section 5 applied to the election of state court judges. *Kirksey v. Allain,* 635 F.Supp. 347 (S.D.Miss.1986) (three-judge court).[9]

---

**9.** Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973c, provides that certain states, including Mississippi, with histories of "substantial voting discrimination," *South Carolina v. Katzenbach,* 383 U.S. 301, 329, 86 S.Ct. 803, 819, 15 L.Ed.2d 769 (1966), must submit changes in a voting practice or procedure to the United States Attorney General or to the United States District Court for the District of Columbia. Section 5 reads in pertinent part as follows:

Whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title ... are in effect shall enact or seek to administer any voting

qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting ... such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title ... [S]uch qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, stan-

Subsequent to the decisions of this Court in *Martin I* and *Martin II*, however, the United States Court of Appeals for the Fifth Circuit determined that section 2 did not cover judicial elections. In *League of United Latin American Citizens Council No. 4434 v. Clements*, ("*LULAC*"), 914 F.2d 620 (5th Cir.1990) (en banc), *rev'd*, — U.S. ——, 111 S.Ct. 2376, 115 L.Ed.2d 379 (1991), the Fifth Circuit held that Louisiana Supreme Court elections were not covered by section 2 because judges were not "representatives" as that term is used in section 2. In reaching its conclusion, the Fifth Circuit stated that "the judiciary serves no representative function whatever: the judge represents no one." *LULAC*, 914 F.2d at 625.

The United States Supreme Court recently settled the question of the applicability of section 2 to judicial elections. In *Chisom*, the Court held that elected judges are, in fact, "representatives" within the meaning of section 2 and that § 2 applies to judicial elections. *Chisom*, — U.S. ——, 111 S.Ct. 2354, 115 L.Ed.2d 348. *Chisom* involved the same Louisiana Supreme Court system for electing judges as was at issue in *LULAC*.[10] After noting that the Fifth Circuit in *LULAC* correctly stated that judges should ideally administer justice unfettered by public sentiment, *Chisom*, — U.S. at ——, 111 S.Ct. at 2366, 115 L.Ed.2d at 366, and after noting that Louisiana had chosen to elect rather than appoint supreme court justices, the Court summarized its rationale for applying section 2 to judicial elections:

> The fundamental tension between the ideal character of the judicial office and the real world of electoral politics cannot be resolved by crediting judges with total indifference to the popular will while simultaneously requiring them to run for elected office. When each of several members of a court must be a resident of

a separate district, and must be elected by the voters of that district, it seems both reasonable and realistic to characterize the winners as representatives of that district ... Louisiana could, of course, exclude its judiciary from the coverage of the Voting Rights Act by changing to a system in which judges are appointed, and in that way, it could enable its judges to be indifferent to popular opinion. The reasons why Louisiana has chosen otherwise are precisely the reasons why it is appropriate for section 2, as well as section 5, of the Voting Rights Act to continue to apply to its judicial elections.

*Chisom* — U.S. at —— – ——, 111 S.Ct. at 2367, 115 L.Ed.2d at 366–67.

In *Houston Lawyers' Assn. v. Attorney General of Texas*, — U.S. ——, 111 S.Ct. 2376, 115 L.Ed.2d 379 (1991), decided on the same day as *Chisom*, the Supreme Court held that section 2 applied to the election of trial judges in the State of Texas. Under *Chisom* and *Houston Lawyers' Ass'n*, therefore, section 2 applies to judicial elections.

### 3. Standard for Proving a Section 2 Violation

■ Plaintiffs alleging vote dilution in violation of section 2 must meet the tripartite threshold test set forth by the Supreme Court in *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). If they satisfy the *Thornburg* tripartite test, they must then demonstrate that under the "totality of the circumstances" they do not have an equal opportunity to "participate in the political process and elect candidates of their choice." *Thornburg*, 478 U.S. at 44, 106 S.Ct. at 2763. These inquiries are district-specific where multimember districts are involved. *Id.* at 59 n. 28, 106 S.Ct. at

dard, practice or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, or upon good cause shown, to facilitate an expedited approval within sixty days after such submis-

sion, the Attorney General has affirmatively indicated that such objection will not be made ...

42 U.S.C. § 1973c.

**10.** The Supreme Court granted certiorari in *Chisom v. Roemer* after the en banc decision of the Fifth Circuit in *LULAC*.

2771 n. 28 ("The inquiry into the existence of vote dilution caused by submergence in a multimember district is district-specific"). A court cannot aggregate data from all challenged districts and conclude that vote dilution exists in each district. *Id.*

### a. Thornburg Tripartite Test

■ The *Thornburg* tripartite test requires plaintiffs alleging section 2 vote dilution claims resulting from multimember or gerrymandered[11] districts to show proof of (1) a sufficiently large and geographically compact minority group population; (2) minority political cohesion; and (3) white bloc voting. The rationale for the test, as the Supreme Court noted, is to require plaintiffs to show that their candidates could prevail in an election absent the allegedly dilutive conduct. *Id.* at 48–51, 106 S.Ct. at 2765–66.

### (1) Sufficiently Large and Geographically Compact Minority Group Population

Under *Thornburg*, plaintiffs alleging a section 2 violation must first establish that the minority group of which they are members is "sufficiently large and geographically compact" to constitute a numerical majority in a single-member district. *Id.* at 50, 106 S.Ct. at 2766. *Accord, Westwego Citizens v. City of Westwego*, ("*Westwego III*"), 946 F.2d 1109 (5th Cir.1991); *East Jefferson Coalition v. Parish of Jefferson*, 926 F.2d 487 (5th Cir.1991); *Brewer v. Ham*, 876 F.2d 448 (5th Cir.1989); *Overton v. City of Austin*, 871 F.2d 529 (5th Cir. 1989).

■ At the outset, the Court notes that Plaintiffs need not establish that the minority group of which they are members would constitute a supermajority within a proposed single-member district. In *Martin II*, the Court held that a figure of 60 percent of total population should be used to create trial court subdistricts in the State of Mississippi as a remedy for section 2 violations. *Martin II*, 700 F.Supp. at 333. In creating this remedy, the Court recognized that the Department of Justice has utilized a guideline of 65 percent total black population, or 60 percent total black voting age population, in approving redistricting plans and fashioning remedies under the Voting Rights Act. *Id.* The Department of Justice arrived at the 65 percent figure by augmenting a simple majority population by 5 percent to account for low minority voter registration; by 5 percent to account for low minority voter turnout; and, if total population rather than voting age population is used, by 5 percent to account for minority population younger than age 18. *See Ketchum v. Byrne*, 740 F.2d 1398, 1415 (7th Cir.1984).

The Supreme Court tacitly approved the use of the 65 percent guideline as an approximate remedial goal for Voting Rights Act violations in *United Jewish Organizations, Inc. v. Carey*, 430 U.S. 144, 164, 97 S.Ct. 996, 1009, 51 L.Ed.2d 229 (1977). In *United Jewish Organizations*, the Court stated that "it was reasonable for the Attorney General to conclude in this case that a *substantial* nonwhite population majority—in the vicinity of 65%—would be required to achieve a nonwhite majority of eligible voters." *Id.* The reason for the 65 percent guideline, as this Court has held, is to ensure minorities "the opportunity to elect a candidate of their choice." *Martin*

---

**11.** "Gerrymandered" districts are those districts that have been drawn in an unusual or illogical manner to enhance the voting power of a particular candidate or voting bloc at the expense of other individuals or groups who would be elected or help elect the candidates of their choice. Black's Law Dictionary defines "gerrymander" as

[a] name given to the process of dividing a state or other territory into the authorized civil or political divisions, but with such a geographical arrangement as to accomplish an ulterior or unlawful purpose, as, for in-

stance, to secure a majority for a given political party in districts where the result would be otherwise if they were divided according to obvious natural lines.

Black's Law Dictionary (5th Ed.1979). Similarly, the Supreme Court has stated that in a "gerrymander" case, plaintiffs claim that the minority group to which they belong "has been split between two or more multimember or single-member districts, with the effect of diluting the potential strength of the minority vote." *Thornburg*, 478 U.S. at 50 n. 16, 106 S.Ct. at 2766 n. 16.

*v. Mabus,* 700 F.Supp. at 333; *Ketchum,* 740·F.2d at 1415.

The 65 percent guideline, therefore, is a general remedial goal in Voting Rights Act cases that is irrelevant to the first part of the *Thornburg* tripartite threshold test for liability.[12] The guideline, if invoked, is generally urged upon courts by plaintiffs seeking to establish "safe" districts that will ensure consistent minority electoral success. *See, e.g., Ketchum,* 740 F.2d at 1402 (court noted that plaintiffs-appellants requested a "new map which ... adopts a 65% minority population guideline for remedial purposes, whenever possible."); *Jeffers v. Clinton,* 756 F.Supp. 1195, 1198 (E.D.Ark.1990) (in fashioning a redistricting plan with approximately 60% black voting age population per district, the court stated that "[o]n a strictly numerical and quantitative view of equality, any district with a BVAP [black voting age population] of 50% or higher would be *per se* lawful. We think the Voting Rights Act means something more than this")." Accordingly, the Court has found no authority for the proposition that the 65 percent guideline can be used to defeat Voting Rights Act claims at the liability stage of proceedings. Courts adhering to the 65 percent requirement do so in attempting to fashion remedies for violations of section 5 and section 2. *See Ketchum,* 740 F.2d. at 1402 (court adhered to guideline in considering alder-

manic ward redistricting plan under section 2); *Jeffers,* 756 F.Supp. at 1195 (three-judge panel adhered to guideline in considering plan of apportionment for Arkansas General Assembly); *Hastert v. State Board of Elections,* 777 F.Supp. 634 (N.D.Ill.1991) (court adhered to guideline in considering congressional redistricting plan). The 65 percent guideline does not factor into a section 2 determination of liability. *See, e.g., Dickinson v. Indiana State Election Board,* 933 F.2d 497, 503 (7th Cir.1991) ("We have cast doubt on such a [supermajority] requirement *as a threshold....* The court may consider, at the *remedial* stage, what type of remedy is possible based on the factors traditionally examined in single-member districts, such as minority voter registration and turn-out rates. [Citation omitted]. But this difficulty should not impede the judge at the liability stage of the proceedings."); *Neal v. Coleburn,* 689 F.Supp. 1426, 1438 (E.D.Va.1988) ("Contrary to defendants' contention, the general 65% guideline for remedial districts is not a required minimum which the plaintiffs must meet before they can be awarded any relief under section 2 of the Voting Rights Act. Rather, the 65% standard is a flexible and practical guideline to consider in fashioning relief for a section 2 violation.").[13]

■ It is important to note that, although *Thornburg* does not so expressly

---

**12.** The Court notes, however, that there is a tension between the *Thornburg* majority threshold requirement and the 65 percent remedial guideline. Proving section 2 liability merely requires a showing that the racial minority group to which plaintiffs belong could constitute a bare majority of the voting age population in a proposed district, but a bare majority district is usually insufficient to allow plaintiffs to elect candidates of their choice. Moreover, a remedial bare majority district might not be approved by the Department of Justice. In voting rights cases where only a bare majority district can be created, the majority threshold requirement and the supermajority remedial emphasis leave courts in a quandary, and pose difficulties for litigants evaluating the merits of potential section 2 claims. Although this issue is present in this action, a determination of it is not necessary for resolution of Plaintiffs' section 2 claims.

**13.** The Court notes, as an aside, that the Department of Justice has expressly disavowed adher-

ence to a *per se* guideline of 65 percent in redistricting cases. In a letter to United States District Judge George C. Carr of the United States District Court for the Middle District of Florida, then Assistant Attorney General William Bradford Reynolds of the Civil Rights Division of the Department of Justice stated in part as follows:

There is no 65 percent threshold population figure applied as a rule of thumb by the Department in redistricting matters reviewed under Section 5 ... Accordingly, the Attorney General has frequently concluded, based on the facts presented in a particular submission, that districts containing a minority population significantly less than 65 percent of the total are racially fair districts and that the plan submitted is entitled to Section 5 preclearance.

*James v. City of Sarasota,* 611 F.Supp. 25, 32–33 (M.D.Fla.1985).

require, the Fifth Circuit has interpreted the first part of the tripartite test to require plaintiffs to show a majority of the *voting age* population in a single-member district, as opposed to a majority of the total population. *See Westwego III,* 946 F.2d at 1117 n. 7 ("This Court has held that in order to satisfy the first *Gingles* factor, plaintiffs ordinarily must show that members of the minority group constitute a majority of the *voting age* population in a single member district."); *Westwego Citizens v. City of Westwego,* ("*Westwego II*"), 906 F.2d 1042, 1046 (5th Cir.1990) ("[A] majority black voting age population in a proposed district [is] generally required to satisfy the first *Gingles* factor."). Plaintiffs must be able to show that they have the potential to elect candidates of their choice. As Judge Jones stated in her concurring opinion in *Overton,*

> "[t]he need for voting age population data ... should be obvious. Only voting age persons can vote. It would be a Pyrrhic victory for a court to create a single-member district in which a minority population dominant in absolute, but not in voting age numbers, continued to be defeated at the polls."

*Overton,* 871 F.2d at 542. (Jones, J., concurring).

■ Thus, to satisfy the first part of the *Thornburg* tripartite test as interpreted by the Fifth Circuit, plaintiffs must show that the minority group of which they are members could comprise a simple majority of the voting age population in a proposed district. *See Brewer,* 876 F.2d at 452 ("[D]istrict courts may rely on such figures as evidence that the minority's voting age population exceeds 50%."). *Accord, Westwego III,* 946 F.2d at 1117, *quoting Brewer,* 876 F.2d at 452 ("All that must be shown is that 'the minority's voting age population exceeds 50%.' ").[14] Plaintiffs must show that their minority group constitutes a majority of the voting age population in a geographical area that could be

configured as a new single-member district, but is presently part of a larger multimember district in which the plaintiffs' group is a numerical minority, or is split into two or more districts in each of which their group is a numerical minority.

Requiring the minority group to demonstrate that it could comprise a numerical majority of the voting age population in a single-member district is, as stated earlier, another way of requiring the minority group to prove that it possesses the capacity to elect representatives of its choice in the absence of alleged discrimination. *See Thornburg,* 478 U.S. at 50 n. 17, 106 S.Ct. at 2766 n. 17. A minority group that is dispersed throughout an existing district cannot claim that a multimember district dilutes its voting strength, because it is the dispersion of the minority group, rather than the multimember district, that accounts for a relative lack of voting strength. *Id.* Similarly, a minority group that is geographically compact but numerically insignificant cannot maintain that a voting practice or procedure dilutes its vote, because the minority group simply lacks the numerical voting strength to elect candidates of its choice. *Id.*

### *(2) Political Cohesion in the Minority Group Population*

The second part of the tripartite *Thornburg* test requires plaintiffs alleging a section 2 violation to show that the minority group of which they are members is "politically cohesive." *Thornburg,* 478 U.S. at 51, 106 S.Ct. at 2766. *Accord, Westwego III,* 946 F.2d at 1118; *East Jefferson Coalition,* 926 F.2d at 492; *Brewer,* 876 F.2d at 453. As the Supreme Court stated in *Thornburg,*

> [i]f the minority group is not politically cohesive, it cannot be said that the selection of a multimember electoral structure thwarts distinctive minority group interests.

---

**14.** § 2 merely requires the "potential to elect." *Thornburg,* 478 U.S. at 50 n. 17, 106 S.Ct. at 2766 n. 17; *Westwego III,* 946 F.2d at 1117 n. 9. It does not require a showing of proportional representation at the liability phase, nor does it

require proportional representation as a remedy. *Westwego III,* 946 F.2d at 1117 n. 9; *Monroe v. City of Woodville,* 881 F.2d 1327, 1329 (5th Cir.1989); *Brewer,* 876 F.2d at 450.

*Thornburg,* 478 U.S. at 51, 106 S.Ct. at 2766. The Court did not explicitly define "political cohesiveness," but stated that courts should examine "racially polarized voting" to "ascertain whether minority group members constitute a politically cohesive unit." *Id.* at 56, 106 S.Ct. at 2769. The Court stated that racially polarized voting exists where there is a "consistent relationship" between voter race and voter choice. *Id.* at 53 n. 21, 106 S.Ct. at 2768 n. 21. Plaintiffs, therefore, can prove political cohesiveness by showing "that a significant number of minority group members usually vote for the same candidate." *Id.* at 56, 106 S.Ct. at 2769. In that regard, a pattern of racial bloc voting over a period of time is "more probative" of political cohesiveness than a single election. *Id.* at 57, 106 S.Ct. at 2769.

The actual degree of bloc voting necessary to show political cohesion, however, varies from district to district. *Id.* at 55–56, 106 S.Ct. at 2768–69. The Fifth Circuit has held that plaintiffs can demonstrate political cohesion without relying on statistical evidence of racial polarization, although statistical evidence is usually employed to prove political cohesion. *See Westwego III,* 946 F.2d at 1118 n. 12; *Brewer,* 876 F.2d at 453; *Overton,* 871 F.2d at 538. Plaintiffs may demonstrate racially polarized voting by utilizing regression analysis, which measures the strength of the correlation and linear relationship between the variables "r" and "r2" that represent the race of the voter and the candidate supported. *See Overton,* 871 F.2d at 529; *Campos v. City of Baytown,* 840 F.2d 1240, 1246 (5th Cir.1988); *Citizens for a Better Gretna v. City of Gretna,* 834 F.2d 496 (5th Cir.1987). The greater the "r" value the higher is the correlation. The "r" value can range from –1 to 1, with 1 being perfect correlation and –1 being perfect inverse correlation. *See Campos,* 840 F.2d at 1246 n. 9. Some courts have based findings of racially polarized voting for "r" values of .8 or higher, although other courts have found an "r" value of .5 to be significant. *See Overton,* 871 F.2d at 544–45 (Jones, J., concurring), *citing, e.g., Campos,* 840 F.2d at 1246 (.8 "r" value as

statistically significant), and *Gingles v. Edmisten,* 590 F.Supp. 345, 368 (E.D.N.C. 1984) (noting that correlations above .5 are rare). The significance of "r" values utilized in regression analysis should not be assumed upon a cursory examination, but should be determined only after a thorough explanation of their characteristics and limitations. *See Overton,* 871 F.2d at 545 (Jones, J., concurring).

■ Elections that involve both black and white candidates are most probative of racially polarized voting. *See Westwego Citizens for Better Government v. City of Westwego,* 872 F.2d 1201, 1208 n. 7 ("Westwego I") (5th Cir.1989); *East Jefferson Coalition,* 926 F.2d at 493; *Campos,* 840 F.2d at 1245. The Fifth Circuit has held that a court may limit its investigation of racial polarization to elections involving minority candidates. *See East Jefferson Coalition,* 926 F.2d at 493; *Campos,* 840 F.2d at 1245. Plaintiffs may rely on evidence from "exogenous" elections, or elections involving other offices, to establish racially polarized voting where there is sparse data from "indigenous" elections involving the office in issue. *See Citizens for a Better Gretna,* 834 F.2d at 502. *Accord, Westwego III,* 946 F.2d at 1119 n. 15; *East Jefferson Coalition,* 926 F.2d at 493.

### (3) Bloc Voting in the White Majority Population

The final part of the tripartite test requires plaintiffs alleging a section 2 violation to demonstrate that the white majority "votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Thornburg,* 478 U.S. at 51, 106 S.Ct. at 2766.

■ Proving white bloc voting is not unlike proving minority political cohesion. Evidence of racial polarity is demonstrative of both. *See Westwego III,* 946 F.2d at 1118. Furthermore, elections involving both white and minority candidates are most probative of white bloc voting. *See East Jefferson Coalition,* 926 F.2d at 493; *Citizens for a Better Gretna,* 834 F.2d at 503. In a manner similar to minority politi-

cal cohesion, plaintiffs attempting to prove white bloc voting need not rely on statistical evidence, *see Westwego III*, 946 F.2d at 1119 n. 15, but may rely on data from exogenous elections, *see Citizens for a Better Gretna*, 834 F.2d at 502. As the Supreme Court stated in *Thornburg*, "in general, a white bloc vote that will defeat the combined strength of minority support plus white 'crossover' votes rises to the level of legally significant white bloc voting." *Thornburg*, 478 U.S. at 56, 106 S.Ct. at 2769.

### b. Totality of the Circumstances

If plaintiffs satisfy the *Thornburg* tripartite test, a court must then consider the "totality of the circumstances" to determine whether the challenged electoral system impedes the ability of plaintiffs to "have an equal opportunity to participate in the political process and to elect candidates of their choice." *Thornburg*, 478 U.S. at 44, 106 S.Ct. at 2763. *Accord, Westwego III*, 946 F.2d at 1120; *East Jefferson Coalition*, 926 F.2d at 491. The Supreme Court has stated that, as a general matter, an inquiry into the "totality of the circumstances" requires "a searching practical evaluation of the past and present reality" and a "functional view of the political process." *Thornburg*, 478 U.S. at 45, 106 S.Ct. at 2764. *Accord, Westwego III*, 946 F.2d at 1120; *Westwego I*, 872 F.2d 1201, 1204 (5th Cir.1989).

More specifically, the "totality of the circumstances" inquiry requires a court to consider in detail the factors included in the Senate Judiciary Committee Majority Report that accompanied the 1982 amendment to section 2. *Thornburg*, 478 U.S. at 36–38, 106 S.Ct. at 2758–59. *Accord, Westwego III*, 946 F.2d at 1120 n. 16; *East Jefferson Coalition*, 926 F.2d at 491; *Campos*, 840 F.2d at 1249; *Citizens for a Better Gretna*, 834 F.2d at 498–99. Congress culled these factors from the decision of the Supreme Court in *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), and the decision of the Fifth Circuit in *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir.1973) (en banc). The factors include, but are not limited to:

(1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

(2) the extent to which voting in the elections of the state or political subdivision is racially polarized;

(3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

(4) if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

(5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

(6) whether political campaigns have been characterized by overt or subtle racial appeals;

(7) the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors which may be probative include:

(8) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

(9) whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Thornburg*, 478 U.S. at 36–38, 106 S.Ct. at 2759, *quoting* S.Rep. No. 417, 97th Cong., 2d Sess. 28–29 (1982), *reprinted in* 1982 U.S.Code Cong. & Admin.News 177, 206–07. *Accord, Westwego III*, 946 F.2d at 1120 n. 16; *Brewer*, 876 F.2d at 451 n. 4.

The Supreme Court has stated that the two most important factors to be considered are the extent to which minority group members have been elected to public office in the jurisdiction and the presence of racially polarized voting. *See Thornburg,* 478 U.S. at 48 n. 15, 106 S.Ct. at 2765 n. 15. *Accord, Westwego III,* 946 F.2d at 1120. In noting their importance, the Supreme Court stated that

> unless minority group members experience substantial difficulty electing representatives of their choice, they cannot prove that a challenged electoral mechanism impairs their ability "to elect." § 2(b). And, where the contested electoral structure is a multimember district, ... in the absence of significant white bloc voting it cannot be said that the ability of minority voters to elect their chosen representatives is inferior to that of white voters.

*Thornburg,* 478 U.S. at 48 n. 15, 106 S.Ct. at 2765 n. 15.

A "totality of the circumstances" inquiry, however, is not limited to a consideration of only those two factors. The other factors may be relevant. No one of the factors is dispositive, and proof of a majority of the factors is unnecessary for plaintiffs to prevail. *See Westwego III,* 946 F.2d at 1120. *See also East Jefferson Coalition,* 926 F.2d at 494 ("The court need not rule on all of the Senate factors as long as it is satisfied that the totality of the circumstances warrant liability."). A court, therefore, may consider the factors enumerated in the Senate Report accompanying the 1982 amendment to the Voting Rights Act and any other relevant factors in evaluating the "totality of the circumstances" pursuant to a section 2 claim of vote dilution.

## II. Findings of Fact and Conclusions of Law

Having set forth the general factual background and law applicable to the present action, the Court now makes its findings of fact and conclusions of law.

Plaintiffs in this action allege that the present system of electing supreme court justices in the State of Mississippi dilutes black voting strength in violation of section 2 of the Voting Rights Act. Plaintiffs make two distinct challenges under section 2. First, Plaintiffs challenge the at-large, multimember, numbered post, and staggered term features of the existing supreme court election system. In addition, Plaintiffs challenge the district lines used to delineate the three existing supreme court election districts.

### A. At-large, Multimember District Challenge

The Court will initially address Plaintiffs' challenge to the at-large, multimember aspects of the present system of electing supreme court justices in the State of Mississippi. The Court notes that Plaintiffs included the numbered post and staggered term features of the system in their Complaint, but Plaintiffs' proof focused on the at-large, multimember aspects of the system and did not directly address the numbered post and staggered term features. The Court, therefore, considers the numbered post and staggered term features only insofar as they are implicated in a discussion of the at-large, multimember features of the supreme court electoral system.

In determining whether the at-large, multimember system, in which three justices in each district are elected for staggered eight-year terms, violates section 2, this Court undertakes its analysis on a district-specific basis, as recognized by the Supreme Court in *Thornburg. See Thornburg,* 478 U.S. at 59 n. 28, 106 S.Ct. at 2771 n. 28. Appendix 1 shows the supreme court districts as they are presently configured.

### 1. District Two: The Southern District

Supreme Court District Two ("Southern District"), covers roughly the southern one-third of the State of Mississippi. Under the 1990 census, the Southern District has a total population of 869,885, and a total black population of 235,601, or 27.08 percent. *See supra,* Table 1; Defendants' Exhibit 2; Factual Stipulations of the Parties, Paragraph 11. The Southern District has a

total voting age population of 619,462, and a total black voting age population of 148,097, or 23.91 percent, under the 1990 census. *See supra*, Table 1; Defendants' Exhibit 2; Parties' Factual Stipulations, Paragraph 11.

### a. Thornburg Tripartite Test

#### (1) Sufficiently Large and Geographically Compact Black Population

To satisfy the first part of the *Thornburg* test, Plaintiffs' expert demographer, Henry Kirksey, attempted to create a majority black single-member district by subdividing the existing Southern District into three subdistricts. Plaintiffs' Exhibit 27. Kirksey avoided splitting counties and attempted to attain a subdistrict population deviation of fifteen percent or less.

Using this methodology, Kirksey was unable to create a single-member district in the existing Southern District with a majority black population or a majority black voting age population. The proposed subdistrict with the highest percentage of eligible black voters, proposed Subdistrict One covering the western segment of the existing Southern District, would have a total black population of 115,764, or 40 percent of the total population of 290,009. There was no proof as to the black voting age population. Kirksey testified that he could create a majority black subdistrict in the existing Southern District if he split counties between subdistricts, but presented no supporting evidence to the Court.

Plaintiffs, therefore, have failed to satisfy the first part of the *Thornburg* tripartite threshold test with respect to the existing Southern District. Accordingly, their section 2 claim challenging the at-large, multimember features of the Mississippi Supreme Court election system as applied to the existing Southern District is without merit and is dismissed.

### 2. District Three: The Northern District

Supreme Court District Three ("Northern District") covers roughly the northern one-third of the State of Mississippi. Under the 1990 census, the Northern District has a total population of 815,365, with a total black population of 264,978, or 32.50 percent. *See supra*, Table 1; Defendants' Exhibit 2; Parties' Factual Stipulations, Paragraph 12. The Northern District has a total voting age population of 583,931, and a total black voting age population of 166,367, or 28.49 percent, under the 1990 census. *See* Defendants' Exhibit 2; Parties' Factual Stipulations, Paragraph 12.

### a. Thornburg Tripartite Test

#### (1) Sufficiently Large and Geographically Compact Black Population

Plaintiffs' expert demographer Kirksey attempted to create a majority black single-member district by subdividing the existing Northern District into three subdistricts. Plaintiffs' Exhibit 28. Kirksey avoided splitting counties and attempted to attain a subdistrict population deviation of fifteen percent or less.

Using this methodology, Kirksey was unable to create a single-member district in the existing Northern District with a majority black population or a majority black voting age population. The proposed subdistrict with the highest percentage of eligible black voters, proposed Subdistrict One extending from the western edge of the existing Northern District to the south-central section of the existing Northern District, would have a total black population of 128,427, or 48 percent of the total population of 266,890. *Id.* There was no proof as to the black voting age population. Kirksey testified that he could create a majority black subdistrict in the existing Northern District if he split counties between subdistricts, but submitted no supporting evidence to the Court.

Plaintiffs, therefore, have failed to satisfy the first part of the tripartite *Thornburg* test with respect to the existing Northern District. Accordingly, their section 2 claim challenging the at-large, multimember features of the Mississippi Supreme Court election system as applied to the existing Northern District is without merit and is dismissed.

### 3. District One: The Central District

District One ("Central District") covers roughly the middle one-third of the State of Mississippi and includes much of the region known as the Mississippi Delta, and the metropolitan Jackson, Mississippi area.

Under the 1990 census, the Central District has a total population of 887,966, and a total black of population of 414,478, or 46.68 percent. *See supra*, Table 1; Defendants' Exhibit 2; Parties' Factual Stipulations, Paragraph 10. The Central District has a total voting age population of 623,064, and a total black voting age population of 263,205, or 42.24 percent, under the 1990 census. *See* Defendants' Exhibit 2; Parties' Factual Stipulations, Paragraph 10.

#### a. Thornburg Tripartite Test

##### (1) Sufficiently Large and Geographically Compact Black Population

Plaintiffs' expert demographer Kirksey attempted to create majority black single-member districts by subdividing the existing Central District into three subdistricts. Plaintiffs' Exhibit 26. Kirksey avoided splitting counties and attempted to attain a subdistrict population deviation of fifteen percent or less.

Kirksey created two proposed subdistricts with total black majority populations, one of which, proposed Subdistrict 2, would have a black majority voting age population. Appendix 2 shows Kirksey's proposed subdistricts within the existing Central District. Proposed Subdistrict Two, which encompasses the western, or Delta section of the existing Central District, includes the following counties: Bolivar, Claiborne, Holmes, Humphreys, Issaquena, Jefferson, Sharkey, Sunflower, Warren, Washington and Yazoo. *Id.* Proposed Subdistrict Two would have a total population of 278,799 and a black population of 165,881, or 59.50 percent. Defendants' Exhibit 10. Proposed Subdistrict Two would have a total voting age population of 187,203, with a total black voting age popula-

tion of 101,570, or 54.26 percent.[15] Defendants' Exhibit 10.

The Court notes an apparent discrepancy between Plaintiffs and Defendants regarding the population deviation in the proposed subdistricts within the existing Central District. Plaintiffs' expert Kirksey testified that Subdistrict One has a total population deviation of −4.7 percent, Subdistrict Two has a total population deviation of −5.8 percent, and Subdistrict Three has a total population deviation of +10.52 percent. Using the percentages given by Kirksey, the total population deviation for the three proposed subdistricts in the existing Central District is 16.32 percent. Defendants' Exhibit 10, however, lists the population deviation in Plaintiffs' proposed Subdistrict One as −1.36 percent, in Plaintiffs' proposed Subdistrict Two as −2.49 percent, and in Plaintiffs' proposed Subdistrict Three as +14.42 percent. Defendants' Exhibit 10. Using the percentages in Defendants' Exhibit 10, the total population deviation for the three proposed subdistricts is 16.91 percent.

This Court has previously held that a fifteen percent maximum range of deviation is appropriate in creating judicial subdistricts. *See Martin v. Mabus*, 700 F.Supp. at 335. Therefore, under either Plaintiffs' or Defendants' proof, Plaintiffs have failed to attain a fifteen percent population deviation. The fifteen percent deviation, however, is not a mandatory threshold in section 2 cases. Accordingly, the Court finds that Plaintiffs' failure to attain a fifteen percent deviation does not foreclose their section 2 claim as to the existing Central District.

Plaintiffs have demonstrated that the black population is sufficiently large and geographically compact to constitute a majority of the voting age population in proposed Subdistrict Two in the existing Central District and have therefore satisfied

---

**15.** Kirksey testified as to the voting age population percentages, which were not reflected in Plaintiffs' Exhibit 26. Defendants' expert con-firmed the accuracy of the percentages. *See* Defendants' Exhibit 10.

the first part of the *Thornburg* tripartite test.[16]

### (2) Political Cohesion in the Black Population

Having determined that Plaintiffs can create a single-member subdistrict in the existing Central District with a majority black voting age population, the Court must now inquire into the second part of the tripartite *Thornburg* test and determine whether Plaintiffs have demonstrated black political cohesion.

Plaintiffs presented Dr. Allan J. Lichtman by affidavit as an expert witness in the areas of racial bloc voting, minority vote dilution, political systems, and quantitative and socioeconomic analysis. *See* Stipulation of Parties Regarding Plaintiffs' Expert Testimony, Paragraph 1. Dr. Lichtman analyzed local, state, and federal elections in the State of Mississippi involving black and white candidates over a twenty-year period ending in 1992.[17] *Id.*, Paragraph 2. The parties stipulated that Dr. Lichtman used accepted ecological and homogenous precinct methods and acceptable values for "r" and "r2" linear correlation in performing his analysis. *Id.*, Paragraph 3. *See also Overton*, 871 F.2d at 544–45 (Jones, J., concurring).

Dr. Lichtman found that 70 to 99 percent of black voters voted for black candidates in elections in which black candidates ran against white candidates, and concluded that

> [r]esults of the ecological regression analyses show a pattern of severe racial polarization in elections held in the State of Mississippi. Analyses results show that black voters are a highly cohesive electorate who invariably support black candidates by substantial majorities.

*Id.*, Paragraph 4.

Defendants contend that blacks are not politically cohesive. In support of their proposition, Defendants introduced the testimony of Kathryn Hester as an expert demographer. Hester analyzed three supreme court elections from the Central District, four supreme court elections from the Southern District, and one supreme court election from the Northern District. *See* Stipulations of Parties Regarding Defendants' Expert, Paragraph 2. Hester also analyzed sixty-six trial court elections throughout the State of Mississippi from 1978 through 1982, *id.*, Paragraph 3, and twelve trial court elections in 1989 and 1990.

Hester specifically relied on data from biracial elections, including the 1991 Supreme Court Central District, Place No. 2 election between black Justice Fred Banks

---

**16.** The Court notes that Plaintiffs' other two proposed subdistricts in the existing Central District do not have majority black voting age populations. Proposed Subdistrict One, which includes only Hinds and Copiah Counties in the existing Central District, would have a total population of 282,033, and a total black population of 143,478, or 50.87 percent. *See* Plaintiffs' Exhibit 26; Defendants' Exhibit 10. The relevant statistic, however, as the Fifth Circuit has held, is black voting age population. *See, supra*, Section I.C.3.a.(1). The total voting age population in proposed Subdistrict One would be 202,798, with a black voting age population of 94,273, or 46.49 percent. *See* Defendants' Exhibit 10. Proposed Subdistrict One in the existing Central District, therefore, would not have a majority black voting age population.

Proposed Subdistrict Three, covering the central-eastern section of the existing Central District, would have a total black population of 105,119, or 32.13 percent of the total population, and a total black voting age population of 67,-362, or 28.90 percent of the total voting age

population. *See* Plaintiffs' Exhibit 26; Defendants' Exhibit 10. Proposed Subdistrict Three is accordingly well below the requisite black majority voting age population.

**17.** Dr. Lichtman analyzed Supreme Court elections and Circuit and Chancery Court elections throughout the State of Mississippi, including elections in the existing Supreme Court Central District. Parties' Stipulations Regarding Plaintiffs' Expert Testimony, Paragraph 2. Dr. Lichtman also analyzed elections in the Second Congressional District in Mississippi, which includes the Mississippi Delta and parts of central Mississippi, and elections in the cities of Cleveland and Jackson in the existing Central District, and elections in the cities of Greenwood and Oxford in the existing Northern District. Finally, Dr. Lichtman analyzed elections in Bolivar County, Hinds County, Madison County, Newton County, and Yazoo County in the existing Central District, and Chickasaw County, Grenada County, Lafayette County and Monroe County in the existing Northern District.

and white challenger W.O. "Chet" Dillard; the 1986 Supreme Court Central District, Place No. 2 election between black former Justice Reuben Anderson and white challenger Richard Barrett; twelve judicial races in 1989 and 1990; and judicial elections studied by Plaintiffs' expert Dr. Lichtman. Both Justice Banks and former Justice Anderson were successful in their electoral efforts, as noted earlier. Hester concluded that blacks are not politically cohesive in judicial elections. In an Eleventh Circuit judicial election between black candidate McDowell and white candidate Pearson, Hester concluded that 40% of blacks voted for the white candidate. In another Eleventh Circuit judicial election between black candidate Morris and white candidate Smith, Hester concluded that 3,000 blacks voted for the white candidate. In a 1978 Eleventh Circuit Chancery Court election between unsuccessful black candidate Smith and successful white candidate Case, Hester concluded that Smith would have won if approximately 3,400 blacks had not voted for the white candidate Case.

Despite Defendants' contentions, the Court finds that there is black political cohesion in the State of Mississippi and in the existing Central District. Dr. Lichtman's expert testimony clearly shows, as this Court previously found in *Martin I*, that blacks overwhelmingly tend to vote for blacks in both judicial and non-judicial elections. *See Martin I*, 658 F.Supp. at 1194. The Court, therefore, finds that Plaintiffs have satisfied the second part of the tripartite *Thornburg* test.

### (3) Bloc Voting in the White Majority Population

The final part of the tripartite *Thornburg* test requires Plaintiffs to show that the majority white population votes sufficiently as a bloc to enable it to usually defeat the candidate preferred by the minority population. As stated earlier, the inquiry into majority bloc voting is similar to black political cohesion, because both inquiries involve evidence of racially polarized voting.[18]

Dr. Lichtman relied on data from the same biracial elections that he used in reaching a finding of black political cohesion. Again, the parties stipulated that Dr. Lichtman used accepted and recognized ecological regression and homogenous precinct methods, and used acceptable values for "r" and "r2". *See* Parties' Stipulation Regarding Plaintiffs' Expert Testimony, Paragraph 3. Dr. Lichtman found that "severe racial polarization" exists in elections held in the State of Mississippi. *Id.*, Paragraph 4. With respect to white bloc voting, Dr. Lichtman found that 70 to 99 percent of whites generally, with some exceptions, vote for white candidates in biracial elections, and concluded that:

> white voters strongly unite behind white candidates, generally providing very little crossover votes for black candidates. This very strong bloc voting by whites would pose a formidable obstacle to

---

**18.** In their post-trial brief, Defendants contend that the third part of the *Thornburg* tripartite test is of limited application to judicial elections, because "the minority's interest in electing judges is the same as the interest of the majority, *i.e.* electing judges that are fair and impartial and not representative of any particular interest." Defendants' Post–Trial Brief at 25. Defendants contend, in other words, that whites cannot vote as a bloc to defeat the "minority's preferred candidate," because minorities in judicial elections do not "prefer" candidates different from those supported by whites.

Defendants' contention is inherently meritless. The Court assumes without a great leap of faith that people of all races have an interest in electing a "fair and impartial" judiciary. This shared interest, however, does not require a court to ignore majority white bloc voting against minority candidates. Under Defendants' reasoning, a court could never fully consider unanimous white bloc voting in judicial elections because both blacks and whites want "good" judges. This conclusion is unwarranted by the history and purpose of the Voting Rights Act, which was enacted to curb the effects of bloc voting, and by the recent decisions in *Chisom* and *Houston Lawyers' Assn.*, in which the Supreme Court held that the Voting Rights Act applies to judicial elections. A shared desire by blacks and whites for a sound judicial system does not diminish the need for vigilance to ensure an equal opportunity to participate in the formation of such a system. Defendants' argument is tantamount to a repudiation of the Voting Rights Act and clearly without merit.

black candidates seeking office in districts with a white voting age majority. *Id.*

Defendants' expert Hester analyzed information relied on by Dr. Lichtman, including the two supreme court elections involving black candidates, plus twelve biracial judicial elections in 1989 and 1990. Hester found that whites do not always vote as a bloc for white candidates in biracial elections.

Hester relied primarily on the Anderson–Barrett 1986 Supreme Court Central District, Place No. 2 election and the 1991 Banks–Dillard Supreme Court Central District, Place No. 2 election. These are the only two Mississippi Supreme Court elections involving black candidates. In the 1986 Anderson–Barrett election, Anderson, the black candidate and an incumbent justice at the time of the election, received approximately 59,168 votes, or approximately 73 percent of the total vote, compared to 21,467 votes, or approximately 27 percent, for Barrett, the white candidate and an "avowed segregationist." *See* Exhibit A to Motion to Continue of former Defendant W.O. "Chet" Dillard; *Martin v. Allain,* 658 F.Supp. at 1193. In the Anderson–Barrett race, Defendants contend, whites did not vote as a bloc for Barrett, the white candidate.

In the 1991 Banks–Dillard election, Banks, the black candidate and an incumbent justice at the time of the election, received 118,122 votes, or approximately 51 percent of the total vote, compared to 111,949 votes, or approximately 49 percent, for the white candidate Dillard. *See* Plaintiffs' Exhibit 36. Dr. Lichtman estimated that Banks received approximately 30 percent of the white vote, combined with nearly unanimous black support. Parties' Stipulation Regarding Plaintiffs' Expert Testimony, Paragraph 6.

Defendants' expert Hester concluded that in the only two supreme court races involving black candidates, the 1986 Anderson–Barrett election and the 1991 Banks–Dillard election, white voters voted

for the black candidates in substantial numbers. Hester concluded that these elections disprove the existence of white bloc voting. Hester cited statistics based on data from Dr. Lichtman concerning white voting in majority white precincts from eight counties in the Central District. Hester studied only those counties where voter registration rolls had been purged or where complete re-registration had occurred, and relied on the 1990 census to determine precinct population by race.[19] Hester used turnout rates estimated by Dr. Lichtman. With regard to the Bank–Dillard election, Hester assumed, as did Dr. Lichtman, that Banks received 100 percent of the black vote in these precincts in ascertaining the extent of Banks' white vote.

Hester found that in Hinds County, Banks received over fifty percent of the white vote in two majority white precincts; received over 45 percent of the white vote in three majority white precincts; and received between 30 and 45 percent of the white vote in six majority white precincts. Blacks comprise less than an estimated three percent of the voting age population in these precincts. In Neshoba County, Hester found that Banks received 65 percent of the vote in an all-white precinct; received approximately 55 percent of the white vote in two virtually all-white precincts; and received between 35 and 45 percent of the vote in six all-white precincts. In Bolivar County, Hester found that Banks received 88 percent of the white vote in one precinct; received 56 percent of the white vote in another precinct; and received over 40 percent in another precinct that was virtually all-white.

Plaintiffs' expert Dr. Lichtman opined that the Anderson and Banks elections were aberrational. Both Anderson and Banks, Dr. Lichtman noted, were incumbents seeking election who had been appointed by white governors. Dr. Lichtman stated that appointed judicial incumbents have "significant advantages" not available to other black candidates in Mississippi and

---

**19.** The Fifth Circuit has held that census data is self-reported and unreliable. *See Mississippi* *State Chapter, Operation PUSH, Inc. v. Mabus,* 932 F.2d 400, 412 (5th Cir.1991).

the South. Parties' Stipulation Regarding Plaintiffs' Expert Testimony, Paragraph 6 (citing experiences in litigation involving the Alabama Supreme Court and Florida Supreme Court).

██ The Court notes that the power of incumbency can be a mitigating factor of which courts should be cognizant in examining the existence of racially polarized voting. In *Thornburg*, the Supreme Court stated that

the success of a minority candidate in a particular election does not necessarily prove that the district did not experience racially polarized voting in that election; special circumstances, such as ... *incumbency* ... may explain minority success in a polarized contest.

*Thornburg*, 478 U.S. at 57, 106 S.Ct. at 2770 [Emphasis added].

Dr. Lichtman examined elections over a twenty-year period and concluded that 70 to 99 percent of white voters usually support white candidates in biracial elections. In *Thornburg*, the Supreme Court stated that "a pattern of racial bloc voting that extends over a period of time is more probative of a claim that a district experiences legally significant polarization than are the results of a single election." *Thornburg*, 478 U.S. at 57, 106 S.Ct. at 2769. The Court further stated that "the fact that racially polarized voting is not present in one or a few individual elections does not necessarily negate the conclusion that the district experiences legally significant bloc voting." *Id.*

Defendants presented proof that the Banks–Dillard contest involved two well-financed candidates, both of whom used extensive television advertisements. Dillard was a sitting chancery judge and a former commissioner of public safety, prosecuting attorney, and assistant attorney general. Banks had substantial and open white support, as did Dillard. Banks had previously been a circuit judge. Thus, this race presented a choice between two experienced judges who were well-known, one of whom was black and the other white. The black candidate won in spite of subtle racial appeals by the white candidate.

The Anderson–Barrett race involved a well-known black former circuit judge and well-known white segregationist. Barrett used overt racial appeals during his campaign. At the end of his first term, Anderson stood for re-election without opposition. Thus, in the two contested races for supreme court seats involving black candidates, the voters knew the race of the candidates and were confronted with racial appeals by the white candidates.

The Court concludes that the election of Anderson and the election of Banks to the Mississippi Supreme Court were not aberrational but evidence that whites will not necessarily vote as a bloc for white candidates having black opponents in Mississippi Supreme Court elections so as to "usually defeat the minority's preferred candidate." *Thornburg*, 478 U.S. at 51, 106 S.Ct. at 2767. The success of these black men represents, not merely personal triumphs but triumphs for the Voting Rights Act itself.[20]

Plaintiffs, therefore, have not satisfied the third prong of the threshold *Thornburg* tripartite test with respect to their claim that the at-large, multimember aspects of the supreme court election system violate section 2 as applied to the existing Central District. Accordingly, their section 2 claim challenging at-large, multimember features of the Mississippi Supreme Court election system as applied to the existing Central District is without merit and is dismissed.

b. Totality of the Circumstances

██ Because of Plaintiffs' failure to meet the tripartite threshold test of *Thornburg*, it is unnecessary to consider the totality of the circumstances. However, because the Court has heard and considered the evidence and arguments of counsel and because the appellate court might disagree with the conclusions of this Court regard-

**20.** The Court also notes the election of black Congressman Mike Espy in the Second Congressional District. Congressman Espy initially defeated an incumbent white congressman and has since been re-elected. Even though the district has a black majority, Congressman Espy has had substantial white support since his initial victory in 1986. Congressman Espy's elections were analyzed by Plaintiffs' expert, Dr. Lichtman.

ing the *Thornburg* threshold test, the Court will make findings of fact and conclusions of law concerning the totality of the circumstances to determine whether the multimember, at-large, staggered term, numbered post supreme court election system violates section 2 as applied to the existing Central District, under the assumption that the threshold test has been met. The totality of the circumstances inquiry, as stated earlier, considers whether the challenged electoral system impedes the ability of Plaintiffs to "have an equal opportunity to participate in the political process and to elect candidates of their choice." That inquiry requires a consideration of the factors listed in the Senate Majority Report that accompanied the 1982 amendment to section 2. *See, supra,* Section I.c.3.b. The Court considers each factor listed in the Senate Report separately below.

### (1) History of Official Discrimination

Prior to the passage of the Voting Rights Act in 1965, the State of Mississippi had a long history of official discrimination that infringed upon the right of black citizens to vote and participate in the democratic process. This Court has previously taken judicial notice of the history of official discrimination in Mississippi, *see Martin I,* 658 F.Supp. at 1192, and other courts have made similar determinations. *See, e.g., United States v. Mississippi,* 380 U.S. 128, 131–36, 85 S.Ct. 808, 809–812, 13 L.Ed.2d 717 (1965).

This history includes the use of poll taxes, literacy tests, and intimidation of black citizens, in addition to more sophisticated forms of discrimination such as at-large elections and majority white election districts.[21] *See, e.g.,* 1955 Miss.Law (Extra Sess.) Ch. 104, *repealed* November 4, 1975 (law requiring potential electors to demonstrate "reasonable understanding of the duties and obligations of citizenship under a constitutional form of government . . ."); 1962 Miss.Laws Ch. 569, Sec. 1, *ineffective* 1965 (law requiring potential electors to fill out applications demonstrating their "good moral character"); 1962 Miss.Laws Ch.

573, Sec. 2, *ineffective* 1965 (law which provided a method by which any qualified elector in a county could challenge the "good moral character" of any potential elector"). *See Martin I,* 658 F.Supp. at 1192.

The Court can and does take judicial notice of the past history of official discrimination in the State of Mississippi. The Court also notes, however, that vast changes have occurred in Mississippi since the passage of the Voting Rights Act of 1965. Through bloodshed and perseverance, black citizens overcame official discrimination and secured the right to vote. It is now incumbent upon blacks, in the absence of official discrimination, to exercise that right for which they struggled so mightily. Apathy is not confined to the minority voting age population but is equally pervasive among whites as well, as recent electoral turnout demonstrates. However, in the context of the Voting Rights Act as applied to "present reality," *Thornburg,* 478 U.S. at 45, 106 S.Ct. at 2764, the extent to which black citizens fail to exercise their obligation to vote diminishes the weight to be given the history of official discrimination.

### (2) Racially Polarized Voting

The Court has already found that there is black political cohesion, and assumes for the purpose of the totality of the circumstances inquiry that there is white majority bloc voting in judicial and non-judicial elections throughout the State of Mississippi, including the existing Central District. The Court therefore reiterates that there is racially polarized voting in the existing Central District and in the State of Mississippi in many elections but not necessarily in biracial elections for seats on the Mississippi Supreme Court.

### (3) Unusually Large Districts, Majority Vote Requirements, Anti–Single-Shot Provisions, or Other Discriminatory Voting Practices or Procedures

The Court has discussed the size of the existing supreme court election districts.

---

**21.** Note, however, that at-large election districts are not *per se* violative of section 2. *See Thorn-* *burg,* 478 U.S. at 46, 106 S.Ct. at 2764; *Brewer,* 876 F.2d at 455.

Multimember, at-large districts are not *per se* discriminatory, but, where a majority black voting age population subdistrict can be created within a multimember district, such districts may violate section 2. In the present action, although the Court has found that a majority black single-member district can be created within the existing Central District, the Court cannot say that the supreme court election districts are so "unusually large" that they are *per se* discriminatory against blacks.

The State of Mississippi also has majority vote requirements for party nomination. Although abolition of the majority vote requirement for party nomination might increase the chances for electoral success for black candidates, *see Martin I,* 658 F.Supp. at 1194, a majority vote requirement is not inherently discriminatory.

Mississippi does not have anti-single shot voting provisions.

### (4) Candidate Slating Process

There is no candidate slating process in Mississippi.

### (5) Socioeconomic Effects of Discrimination

There are substantial socioeconomic disparities between blacks and whites in Mississippi. Dr. Richard Engstrom, Plaintiffs' expert in socioeconomic analysis, political systems, and political participation, testified by affidavit that as of the 1980 census, 47.3 percent of blacks in Mississippi had no more than an elementary school education, compared to 18.3 percent of whites. Parties' Stipulation Regarding Plaintiffs' Expert Testimony, Paragraph 10. Dr. Engstrom testified that only 32.7 percent of blacks in Mississippi had graduated from high school, compared to 63.9 percent of whites. *Id.*

In the area of health, the most significant statistic is the infant mortality rate. In 1982, the Mississippi State Board of Health reported that the infant mortality rate for non-whites in the State of Mississippi was 20.9 per 1,000 live births, compared to 10.4 per 1,000 live births for whites. Parties' Factual Stipulations, Paragraph 26, *citing Mississippi Statistical Abstract,* 1984.

Blacks also trail whites in the area of economic attainment. Dr. Engstrom testified that 55.1 percent of black families in the State of Mississippi had an annual income of less than $10,000, compared to 24.4 percent of whites. Parties' Stipulation Regarding Plaintiffs' Expert Testimony, Paragraph 11. Dr. Engstrom testified that 7.5 percent of black families had an income of $25,000 or more, compared to 26.9 percent of white families. *Id.* According to the 1980 census estimates, 44.4 percent of blacks in Mississippi had incomes below the poverty level, excluding government transfer payments, compared to 12.6 percent of whites. *Id.,* Paragraph 27.

The Court finds that blacks in Mississippi continue to bear the effects of discrimination in critical areas of socioeconomic attainment and this continues in some ways to affect their opportunity to participate in the political process and to elect representatives of their choice. A person with less education is less likely to vote than one with more education. A person with less money is less likely to own an automobile and therefore less likely to make the effort to go to the polls to vote or to the courthouse to register. However, since the passage of the Voting Rights Act of 1965 and the rendition of *White v. Regester* and *Zimmer v. McKeithen,* both in 1973, the black population has obtained substantial education regarding voting and the political process. Unfortunately, the socioeconomic standing of blacks vis-a-vis whites has changed little and it is unlikely that standing will improve markedly in the foreseeable future. Accordingly, this Senate Majority Report factor, the socioeconomic effects of discrimination, will be a factor on which the plaintiffs in voting rights cases will always win in the foreseeable future. The issue thus becomes one of weight to be afforded this factor.

### (6) Racial Appeals in Political Campaigns

Supreme court and other judicial campaigns in Mississippi have been character-

ized by overt and subtle racial appeals. For example, in the 1986 Supreme Court Central District, Place No. 2 election, avowed segregationist Barrett relied on overt racial appeals in his unsuccessful attempt to defeat black former Justice Anderson.

Plaintiffs contend that subtle racial appeals characterized the 1991 Supreme Court Central District, Place No. 2 election between Justice Banks, a black, and his white opponent Dillard. Dillard's campaign utilized advertisements and literature that pictured both Dillard and Banks. Plaintiffs contend that the inclusion of Banks' picture was an attempt by Dillard to sway white voters. Bob Owens, a black attorney in Jackson, Mississippi active in the campaigns of Banks and other blacks running for judicial offices, testified that black candidates in majority white districts in Mississippi avoid emphasizing race in campaign advertising. In the Banks–Dillard election, Owens testified that the Banks campaign deliberately avoided showing Banks' picture in television and print advertisements for fear of alienating white voters. The Court is asked to infer, therefore, that Dillard's inclusion of Banks' picture in Dillard's campaign advertisements and literature constituted a subtle racial appeal to white voters.

Plaintiffs also claim that racial appeals have characterized lower court elections in Mississippi. The Honorable Patricia Wise, a black Chancery Court Judge in Hinds County, Mississippi, testified that she faced racial appeals in her judicial campaign against her white opponent, who distributed a campaign brochure with Wise's picture in an alleged attempt to draw attention to Wise's race. Wise was, nevertheless, elected.

Lillie Blackmon Sanders, a black attorney in Natchez, Mississippi, testified that she faced racial appeals in 1989 and 1990 judicial elections. Sanders was appointed Circuit Judge for the 6th Judicial District in 1989, and ran for election later in the year. Her opponent, Richard Watson, a white, distributed campaign literature to white voters that included a picture of Sanders.

Watson defeated Sanders in the election. In 1990, Sanders ran for another judicial office. In the 1990 campaign, her opponent, Rusty Jenkins, a white, substituted his picture for Watson's picture and distributed the same piece of campaign literature to white voters.

From this evidence, the Court finds that subtle and overt racial appeals have characterized some supreme court elections and other judicial elections in Mississippi, although the appeal for voters by both black and white candidates crosses racial lines, thereby minimizing the importance of this factor under the totality of the circumstances.

### (7) Minority Electoral Success

Blacks have attained significant electoral success in the State of Mississippi in judicial and non-judicial elections. *See* Plaintiffs' Exhibit 3. The Court has noted above that two blacks, former Justice Reuben Anderson and current Justice Fred Banks, have been elected to the Mississippi Supreme Court. At the federal level, the Court notes that United States Congressman Mike Espy, who represents the Second Congressional District in Mississippi, is black. In addition, numerous blacks have been elected to judicial offices and non-judicial offices throughout Mississippi. The Court finds, therefore, that blacks have enjoyed considerable electoral success in Mississippi. Much of this success can be directly attributed to the Voting Rights Act and the Mississippi litigation under it.

### (8) Lack of Responsiveness to the Particularized Needs of Blacks

Plaintiffs submitted no proof regarding a lack of responsiveness of elected officials, and specifically the justices of the Supreme Court of the State of Mississippi, to the particularized needs of blacks.

### (9) Tenuousness of State Policies Underlying Multimember, At–Large Districts

Tenuous, according to Webster's *Third New International Dictionary,* means

"having little substance or strength" or "not firmly based or supported." Thus, the question addressed by this factor is whether the policies of the State of Mississippi as set forth in its Constitution and statutes regarding the election of its supreme court justices have substance and are firmly based upon or supported by genuine state interests. The Court finds that state policies underlying multimember, at-large supreme court districts are not tenuous. Dr. Westley Busbee, Defendants' expert in the fields of history and political science, and Chief Justice Roy Noble Lee of the Mississippi Supreme Court, testified that the existing multimember, at-large districts, which have remained unchanged, for the most part, since the Mississippi Constitutional Convention of 1832, foster independence on the supreme court because individual justices are not beholden to the interests of a small geographic area. Under the existing system in which justices run for election from relatively large areas, a justice can theoretically render a decision that is unpopular in a particular area within his or her district without fearing retributive defeat in the next election. Defendants contend that justices would be averse to rendering unpopular decisions if a relatively small area comprised an entire single-member district. Irrespective of the independence of an elected versus an appointed judiciary, the Court finds that multimember, at-large districts, as compared to single-member districts, further a valid state policy of preserving independence on the Mississippi Supreme Court.

The Court also notes that there is a valid state policy underlying the staggered term feature of supreme court elections. Chief Justice Lee testified, and the Court agrees, that staggered terms preserve continuity on the Court by preventing the theoretical possibility of all nine justices being defeated in a single election. Continuity, in turn, prevents erratic swings in judicial holdings on the same issues.

Established state policy as reflected by the current method of electing supreme court justices may also be evaluated by examining the alternatives the State of Mississippi has not chosen. This inquiry is ordinarily reserved for the remedy stage in a case such as this, but because the number of alternatives is small, the reasons for existing state policies may be extrapolated from the failure to select those alternatives. Obviously the state could have chosen to elect justices on a statewide basis or to appoint them. Since those are not alternatives Plaintiffs would seek, or that the Court could consider, they will not be discussed further. Since Plaintiffs seek single-member districts, the possibilities are limited: 1) nine separate districts, one for each justice; 2) leave the Northern and Southern Districts as at-large districts and divide the Central District into (a) three subdistricts, one with a black majority, or (b) one single-member subdistrict with a black majority and one multimember subdistrict from which two posts would be elected at large. The first alternative of nine separate districts would politicize the supreme court more than the present system. Either choice under the second alternative would leave different parts of the state electing justices in different manners and might result in the devaluation of the prestige of the seat or seats elected from subdistricts.

The Court thus concludes that the policies of the State of Mississippi that underlie the existing supreme court electoral system have substance and are firmly based upon and supported by genuine state interests in maintaining an elected supreme court that is insulated as much as possible from political interference in its decision-making process.

Having discussed the Senate Majority Report factors, the Court weighs them under the totality of the circumstances inquiry. That inquiry does not demand a quantitative analysis of those factors, but rather "a searching practical evaluation of the past and present reality." *Thornburg,* 478 U.S. at 79, 106 S.Ct. at 2781. The past reality for these Plaintiffs and for those they represent was truly harsh. Black people today face harsh realities in their socioeconomic circumstances. However, their political circumstances have changed drastically since the passage of the Voting

Rights Act nearly thirty years ago. The process is not yet complete. The Court under the facts and circumstances presented, however, must conclude that those harsh realities of the past have indeed changed insofar as they related to the election of Mississippi Supreme Court justices.

Of the nine Senate Majority Report factors considered by the Court, the Plaintiff proved only three favoring them: the history of official discrimination, the socioeconomic effects of discrimination, and the fact of racial appeals in political campaigns. As stated above, the Court in this case assigns little weight to these factors. On the other hand, with respect to the two most important Senate Majority Report factors, racially polarized voting and minority electoral success, *see Thornburg*, 478 U.S. at 48, n. 15, 106 S.Ct. at 2765, n. 15, the Court has found that whites do not vote as a bloc against black candidates in biracial supreme court elections, and has further determined that blacks have had substantial success in elections throughout Mississippi, and have had complete success in electing black candidates to the Mississippi Supreme Court. Also, the Court has found that there is no lack of responsiveness by the supreme court to black litigants and, importantly in this particular case, that the state policies of using the multimember, at-large, staggered term, numbered post election system are not tenuous.

In *Houston Lawyers' Assn.*, the Supreme Court stated that courts may consider state policies in assessing the totality of the circumstances that may preclude a finding of vote dilution. The Court stated that

the State's interest in maintaining an electoral system ... is a legitimate factor to be considered by courts among the 'totality of circumstances' in determining whether a section 2 violation has occurred. A State's justification for its electoral system is a proper factor for the courts to assess in a racial vote dilution inquiry

... [although] that interest does not automatically, and in every case, outweigh proof of racial vote dilution.

*Houston Lawyers' Assn.*, —— U.S. at ——, 111 S.Ct. at 2381, 115 L.Ed.2d at 387. This Court, accordingly, finds that significant weight may be given to legitimate state policies under the totality of the circumstances inquiry.

Mississippi is entitled to elect its judges, and if it does so, it is entitled to have policies which will remove its judges from some political pressures so long as it does not do so in a manner violative of section 2 of the Voting Rights Act. The decision for the Court here is whether the Plaintiffs have proven a section 2 violation by a preponderance of the evidence under the totality of those circumstances. The Court finds that they have not.

The Court accordingly finds that a weighing of the totality of the circumstances leads to the conclusion that the present multimember, at-large, staggered term, numbered post election system for seats on the Mississippi Supreme Court does not impede the ability of black voters to have an equal opportunity to participate in the political process and to elect candidates of their choice.

Accordingly, even if the Court has incorrectly found that the Plaintiffs have failed to meet the third part of the *Thornburg* tripartite test regarding the Central District, their section 2 claim challenging the at-large, multimember features of the Mississippi Supreme Court election system as applied to the existing Central District is without merit under the totality of the circumstances evaluation and should be dismissed on that basis as well.

**B. District Lines Challenge**

■ Plaintiffs also challenge the district lines which divide the State of Mississippi into three east-west supreme court districts. Plaintiffs contend that the east-west configuration of the lines dilutes black voting strength by dividing the black population on the western side of the state, which includes approximately two-thirds of the blacks in Mississippi according to Plaintiffs' expert Kirksey, into three majority white districts.

Plaintiffs' expert demographer Kirksey attempted to design three new districts extending from north to south, and to design three single-member districts within each new north-south district. Kirksey initially avoided splitting counties, but subsequently proposed a subdistricting plan that split counties between subdistricts. *See* Plaintiffs' Exhibit 29 and Exhibit 37.

Defendants ask the Court to dismiss Plaintiffs' challenge to the configuration of the existing supreme court districts because, according to Defendants, Plaintiffs' proposed alternative would create a section 2 violation which does not presently exist under the east-west district lines. Defendants contend that the Court must not disregard the existing district lines. Defendants rely on Judge Jones' concurring opinion in *Overton*, in which she stated that proposed action by the plaintiffs "would create a voting rights violation where none presently existed by enabling [plaintiffs] to meet the necessary preconditions of their Section 2 claim." *Overton*, 871 F.2d at 543, *quoting McNeil v. Springfield Park District*, 851 F.2d 937, 946 (7th Cir.1988). Defendants reason from Judge Jones' concurrence that Plaintiffs are constrained to proceed within the parameters of the existing supreme court districts. Creating new districts without regard for the existing districts would, Defendants argue, create a voting rights violation where none currently exists.

The Court finds that Defendants' reliance on Judge Jones' concurrence is misplaced, and their argument illogical. Judge Jones' concurrence referred to the plaintiffs' attempt to evade the first part of the *Thornburg* tripartite test by advocating an increase in the number of positions on a city council. Judge Jones stated that "actionable vote dilution must be measured against the number of *positions* in the existing governmental body rather than some hypothetical model ..." *Overton*, 871 F.2d at 543 [Emphasis added]. To proceed otherwise, as Judge Jones succinctly noted, "puts the cart before the horse." *Id.* In the present action, Plaintiffs do not seek an expansion of the Mississippi Supreme Court from nine justices to a number that would accomplish proportional representation of blacks. Plaintiffs are challenging the way in which the districts are drawn.

■■■ Moreover, Defendants misconstrue the types of vote dilution claims properly cognizable under section 2. Minority vote dilution may occur when the minority is subsumed in a larger, multimember district. The Court addressed this type of vote dilution in Section II.A., *supra*, of this Memorandum Opinion and Order. Minority vote dilution may also occur, as Defendants fail to perceive, when a racial minority that would otherwise constitute a numerical majority in a single-member district is "cracked," or "fractured," into two or more larger multimember districts. As the Supreme Court noted in *Thornburg*, "dilution of racial minority group voting strength may be caused by the dispersal of blacks into districts in which they constitute an ineffective minority of voters ..." *Thornburg*, 478 U.S. at 46 n. 11, 106 S.Ct. at 2764 n. 11. The Court further noted that, in a vote dilution case, "plaintiffs might allege that the minority group that is sufficiently large and compact to constitute a single-member district has been split between two or more multimember or single-member districts." *Id.* at 50 n. 16, 106 S.Ct. at 2764 n. 16. *See e.g., McGhee v. Granville County*, 860 F.2d 110, 115 n. 7 (4th Cir.1988) ("Districting may dilute racial minority voting power by ... fracturing."); *Ketchum*, 740 F.2d at 1408 n. 8 (7th Cir.1984) (noting that "fracturing" can result in vote dilution); *Nevett v. Sides*, 571 F.2d 209, 219 (5th Cir.1978) (court found no distinction between gerrymander and at-large vote dilution claims); *Robinson v. Commissioners*, 505 F.2d 674 (5th Cir. 1974) (court found that apportionment plan impermissibly gerrymandered black voting strength).

As the Supreme Court and other courts have made clear, the Voting Rights Act, contrary to Defendants' argument, applies to racial gerrymandering. Plaintiffs, therefore, are not "creating a violation where none exists" by alleging that a sufficiently large and geographically compact

black population has been "fractured" or gerrymandered into two or more areas in which blacks comprise a numerical minority.[22]

*Thornburg* involved a challenge to multimember, at-large electoral districts and did not expressly hold that the tripartite test should be applied to all section 2 claims. *Thornburg*, however, recognized the validity of other types of vote dilution claims, as discussed earlier in this Memorandum Opinion and Order, and lower courts, accordingly, have applied the tripartite test to claims of fracturing or racial gerrymandering. *See, e.g., Gunn v. Chickasaw County*, 705 F.Supp. 315, 318 (N.D.Miss. 1989) (court held that *Thornburg* tripartite test applied to "fracturing" claims); *Jeffers v. Clinton*, 730 F.Supp. 196, 204–5 (E.D.Ark.1989) (three-judge panel rejected the argument that *Thornburg* did not apply to "fracturing" claims); *Neal*, 689 F.Supp. at 1435 (court held that *Thornburg* implicitly recognized the application of the tripartite test to "fracturing" claims). *See also East Jefferson Coalition*, 926 F.2d at 491 (court implicitly held that *Thornburg* tripartite test applies to gerrymandering claims); *Jones v. City of Lubbock*, 727 F.2d 364, 370 n. 2 (5th Cir.1984) (court noted in pre-*Thornburg* case that no distinction existed between "gerrymander" and "dilution," multimember cases for analytical purposes). *Thornburg* would have addressed a "fracturing" claim had that claim been appealed. *See Gingles v. Edmisten*, 590 F.Supp. 345 (E.D.N.C.1984) (defendants

did not appeal the finding of the district court that a single-member district violated section 2).

The preceding authorities demonstrate the applicability of the *Thornburg* tripartite test to "fracturing" or "gerrymander" cases. The Court, therefore, applies the *Thornburg* tripartite test to Plaintiffs' challenge to the supreme court district lines.

### 1. Three North–South Districts Without Splitting Counties

Plaintiffs' expert Kirksey designed three new north-south multimember districts without regard to the existing supreme court districts, and without splitting counties. District One encompasses the western part of the state, District Two encompasses the southeast part of the state, and District Three encompasses the central and northeast parts of the state. Plaintiffs' Exhibit 29. Kirksey attempted to attain a total population deviation of fifteen percent or less.

In contending that the existing districts improperly dilute black voting strength, Plaintiffs are alleging that a black geographic area that could be configured as an electoral district is presently fractured into two or more majority white electoral districts. Plaintiffs attempted to prove, therefore, that one or more black single-member districts can be created irrespective of the existing supreme court districts.

**22.** In arguing that Plaintiffs could not proceed in derogation of existing district lines, Defendants may have been attempting to rely on language from *Thornburg* pertaining to section 2 "ability to influence" claims. In footnote 12 of *Thornburg*, the Supreme Court stated that it did not consider whether section 2 permitted claims brought by a minority group that was not large enough to constitute a numerical majority in a single-member district but could still "influence" an election, and, if permissible under section 2, the standard which would apply to such claims. *Thornburg*, 478 U.S. at 46 n. 12, 106 S.Ct. at 2764 n. 12. Courts have struggled with the applicability of *Thornburg* to section 2 "ability to influence" claims, which are not before the Court in the present action. *See Garza v. County of Los Angeles*, 918 F.2d 763, 769 (9th Cir.1990) (court held that the first part of the *Thornburg* tripartite test applies only where

there has been no proof of intentional discrimination); *McNeil*, 851 F.2d at 937 (7th Cir.1988) (court applied *Thornburg* test to bar plaintiffs' ability to influence claim); *Hastert*, 777 F.Supp. at 651, 655 (court refused to limit the first part of the *Thornburg* tripartite test to multimember districts, and rejected plaintiffs' ability to influence claim); *East Jefferson Coalition v. Jefferson Parish*, 691 F.Supp. 991, 1006 (E.D.La.1988) (court interpreted first part of *Thornburg* tripartite test to allow plaintiffs' ability to influence claim); *Skorepa v. City of Chula Vista*, 723 F.Supp. 1384, 1392 (S.D.Cal.1989) (court rejected plaintiffs' ability to influence claim). *See also* Abrams, *"Raising Politics Up": Minority Political Participation and Section 2 of the Voting Rights Act*, 63 N.Y.U.L.Rev. 449, 468 (1988) (stating that the possibility of an "ability to influence" claim "may prove to be *Gingles'* more enduring and problematic legacy.").

### a. Thornburg Tripartite Test

#### (1) Sufficiently Large and Geographically Compact Black Population

None of the three proposed multimember districts drawn without splitting counties satisfies the first part of the *Thornburg* tripartite test, which requires a sufficiently large and geographically compact black majority voting age population. District Two has a total population of 853,425, of whom 200,507, or 23.49 percent are black. *Id.* District Two therefore fails to satisfy the first part of the test. Population totals are unspecified for District Three, but the proposed subdistricts, discussed *infra*, within District Three have black populations well below a majority. District Three therefore fails to satisfy the first part of the test.

District One comes the closest of the three proposed districts to satisfying the first part of the *Thornburg* tripartite test. District One has a total population of 860,-350, of whom 465,299, or 54.08 percent are black. *Id.* Plaintiffs' expert Kirksey testified on cross-examination, however, that District One has a total black voting age population of approximately 49 percent. Because voting age population, rather than total population, is the relevant statistic, Plaintiffs have failed to satisfy the first part of the *Thornburg* test with respect to proposed District One.

### 2. Subdistricts Within the Proposed North–South Districts

Plaintiffs' expert Kirksey attempted to create three new subdistricts within each of the three proposed north-south districts. Plaintiffs' Exhibit 29. Kirksey initially created the subdistricts without splitting counties, and attempted to attain a population deviation of fifteen percent or less. *Id.* On rebuttal, Kirksey offered proof of subdistricts created without regard for county lines. *See* Plaintiffs' Exhibit 37. Appendix 3 shows Kirksey's proposed subdistricts within proposed District One. Appendix 3 does not show subdistricts within proposed Districts Two and Three because Plaintiffs did not prove that they could create majori-ty black subdistricts in Districts Two and Three.

The Court addresses each proposed subdistrict within proposed District One below.

### a. Thornburg Tripartite Test

#### (1) Sufficiently Large and Geographically Compact Black Population

Without splitting counties, Plaintiffs' expert Kirksey was able to create one subdistrict, Subdistrict 1–2, with a majority black voting age population. Plaintiffs' Exhibit 29. Subdistrict 1–2, which includes most of the Mississippi Delta and extends from Bolivar County in the north to the Louisiana state line in the south, has a total population of 288,008, with a total black population of 165,368, or 57.41 percent. *Id.*

Kirksey did not specifically testify as to the voting age population in proposed Subdistrict 1–2. Defendants' expert Hester, however, did not contend that Subdistrict 1–2 had less than a black majority voting age population. Without splitting counties, Hester also created a proposed subdistrict, configured differently than Kirksey's proposed Subdistrict 1–2, with a majority black voting age population of 57.24 percent. *See* Defendants' Exhibit 11, Proposed Subdistrict III–1. Finally, with respect to voting age population, the Fifth Circuit has held that where total black population in a proposed district is "sufficiently large," a court may rely on such figures as evidence of voting age population. *See Westwego III*, 946 F.2d at 1117, n. 7; *Brewer*, 876 F.2d at 452; *Westwego II*, 906 F.2d at 1046. Although the Fifth Circuit has expressly refused to adopt a uniform method of determining black voting age population by subtracting five percent from total black population, the Court concludes that Plaintiffs' proposed Subdistrict 1–2 has a black voting age population in excess of 50 percent. Even if this conclusion were erroneous, the Court finds that a black majority subdistrict can be created without splitting counties, as demonstrated by the testimony of Defendants' expert Hester and Defendants' proposed Subdistrict III–1, which has a majority black voting age population. *See* Defendants' Exhibit 11.

Kirksey also attempted to create subdistricts by splitting counties, while still maintaining a population deviation of less than fifteen percent. Plaintiffs' Exhibit 37. Kirksey testified that he could create a second majority black subdistrict by moving the Madison, Ridgeland, Madisonville and Trace Harbor precincts in Madison County to another subdistrict; by moving Precinct 78, Precinct 46 and Precinct 79 in Hinds County to another subdistrict; and by moving Lawrence County to another subdistrict. Kirksey testified that a subdistrict with a total black population of 54.71 percent and a black voting age population of 50.01 percent could be created after removing these areas.

The Court addresses Plaintiffs' proposed subdistricts drawn without regard for county lines in Section II.B.2.b.(1), *infra.* At this juncture, it is sufficient that Plaintiffs have shown that a majority black voting age subdistrict may be created without splitting counties and have therefore satisfied the first part of the tripartite *Thornburg* test with respect to their section 2 challenge of the existing supreme court districts.[23]

### (2) Political Cohesion in the Black Population

The Court has already determined, from an analysis of judicial and non-judicial elections, that blacks in the State of Mississippi are politically cohesive. *See, supra,* Section II.A.3.a.(2) and II.A.3.b.(2).

### (3) Bloc Voting in the White Majority Population

The Court has previously found in this Memorandum Opinion and Order that whites do not necessarily vote as a bloc in elections involving black and white candidates in the present supreme court Central District. *See, supra,* Section II.A.3.a.(3). That finding, however, was district specific. The Court was also presented with substantial evidence that whites have voted as a bloc in elections for state trial judges. Accordingly, the Court concludes, contrary to but not inconsistent with its earlier finding, that in regard to the district lines challenge, Plaintiffs have shown by a preponderance of the evidence that whites in Mississippi generally vote as a bloc.

In summary, in regard to their district lines challenge, Plaintiffs have shown that a majority black voting age population single-member district can be created without splitting counties; that blacks are politically cohesive; and that whites vote as a bloc. The Court finds, therefore, that Plaintiffs have satisfied the tripartite *Thornburg* test with respect to their claim that the existing supreme court district lines impermissibly dilute black voting strength.

### b. Totality of the Circumstances

Having determined that Plaintiffs have satisfied the *Thornburg* test, the Court now inquires into the totality of the circumstances to determine whether Plaintiffs have established a section 2 claim with respect to their challenge to the existing supreme court district lines.

The Court has previously considered the Senate Majority Report factors with regard to Plaintiffs' challenge to the multimember, at-large features of the supreme court election system. The Court now makes the same findings of fact regarding the Senate Majority Report factors as it did earlier in this Memorandum Opinion and Order, except as to racially polarized voting. The Court makes specific findings below with regard to the state policies that justify the configuration of the existing district lines.

---

**23.** In attempting to show the feasibility of a second proposed black majority subdistrict by using split counties, Plaintiffs' expert Kirksey stated that the entire proposed western district using split counties, including the two majority black subdistricts, would have a black voting age population of 50.24 percent. However, Plaintiffs did not urge the Court to adopt three multimember districts with split counties, and apparently presented such evidence to demonstrate that the standard deviation of the proposed subdistricts was less than fifteen percent. The Court, therefore, will not determine whether a proposed north-south multimember district with split counties would satisfy the *Thornburg* tripartite test and totality of the circumstances inquiry.

### (1) Tenuousness of State Policies Underlying Existing Supreme Court District Lines

The Court finds that there are valid state policies for the existing district lines, and finds that these policies, when considered under the totality of the circumstances, foreclose Plaintiffs' district lines vote dilution claim.

The Court reiterates that the Supreme Court has stated that courts may give substantial weight to valid state policies in a totality of the circumstances inquiry. *Houston Lawyers' Assn.*, —— U.S. at ——, 111 S.Ct. at 2381, 115 L.Ed.2d at 387. Legitimate state policies may therefore preclude a finding of vote dilution.

Defendants contend that the east-west configuration of the district lines fosters political and economic diversity. The lines, when initially configured in 1832, cut across the sharply divergent interests of the landed aristocracy in the west and the populists in the east. Defendants' expert Dr. Busbee testified that a north-south configuration of the district lines at the time of their creation would have resulted in homogenous districts lacking political and economic diversity. The east-west configuration of the district lines, which combined diverse political and economic interests, was maintained after the 1890 Constitutional Convention.

The divergence of interests between east and west in present day Mississippi, Defendants contend, is vastly different from what previously existed, but economic and political differences nevertheless persist. Dr. Busbee testified that the interests of the State of Mississippi in having economically and politically diverse supreme court districts would be "reversed" if the lines were reconfigured in a north-south fashion. Dr. Busbee also testified that the lines, which have remained largely unchanged since their original configuration in 1832,

were not drawn with racially discriminatory intent, because blacks could not vote at the time that the lines were created.[24] The Court finds that there are valid state policies for the east-west configuration of the supreme court district lines.

Furthermore, the Court finds that there is a strong policy in voting rights cases for preserving county lines when creating or proposing new districts. Numerous courts, including this Court, have held that proposed redistricting plans should maintain historical, geographical or political boundaries, and should strive as well for compactness and contiguousness. *See, e.g., Marshall v. Edwards*, 582 F.2d 927, 937 (5th Cir.1978) ("The boundaries should be drawn with an eye to compactness, contiguousness, and the preservation of natural, political, and traditional boundaries."). *Accord, Washington v. Tensas Parish School Board*, 819 F.2d 609, 611 (5th Cir.1987); *Wyche v. Madison Parish Police Jury* ("*Wyche II*"), 769 F.2d 265, 268 (5th Cir. 1985); *Wyche v. Madison Parish Police Jury* ("*Wyche I*"), 635 F.2d 1151, 1163 (5th Cir.1981); *Parnell v. Rapides Parish School Board*, 563 F.2d 180, 186 (5th Cir. 1977); *Martin v. Mabus*, 700 F.Supp. at 334. Plaintiffs implicitly conceded the viability of this principle during the presentation of their case by proposing only districts drawn without splitting counties, and failing to introduce, until rebuttal, evidence of proposed districts with split counties. The Court finds that Plaintiffs' proposed subdistricts drawn with split counties between subdistricts do not respect county lines as natural political boundaries. Dividing counties between subdistricts as large as those proposed by Plaintiffs would be confusing and burdensome to candidate and voter alike. There is a strong public policy in Mississippi of drawing supreme court districts along county lines and that policy is a valid one.

24. The Court notes, of course, that the absence of a discriminatory purpose behind an electoral system is not probative as to whether such a system produces discriminatory results. *See, e.g., Thornburg*, 478 U.S. at 43–44, 106 S.Ct. at 2762–63 and n. 8 (stating that the Senate and Majority Report which accompanied the 1982 amendments to section 2 rejected the notion that proof of intent was necessary to prevail on a vote dilution claim); *Westwego I*, 872 F.2d at 1210 (noting that the "focal point" of a section 2 inquiry is on discriminatory results, and not on the absence of discriminatory intent at time of adoption of challenged system).

Moreover, even if the Court were to accept the feasibility of Plaintiffs' proposed subdistricts that utilize split counties, Plaintiffs' second proposed subdistrict has, according to Plaintiff's expert, a black voting age population of only 50.01 percent. This conclusion by Plaintiffs' expert is questioned in light of a black majority of only 54.71% in that proposed sub-district. This exceedingly slim majority is perhaps non-existent. The Court is mindful that voting age population data should be reliable, and notes that courts should be wary of numerically unstable majorities. *See Overton,* 871 F.2d at 542 (Jones, J., concurring) (noting that in most cases, voting age population is "comfortably over 50 percent."); *Brewer,* 876 F.2d at 451–52 (court could not conclusively determine that a total black subdistrict population of 55.91 percent would have a majority black voting age population). The Court finds that Plaintiffs have failed to prove by a preponderance of the evidence that a second subdistrict with a black voting age majority can be created. Accordingly, as a practical matter Plaintiffs would gain nothing from splitting counties in contravention of natural political boundaries.

Defendants have articulated valid policies for preserving the east-west configuration of the existing supreme court districts. Plaintiffs have demonstrated a history of official discrimination, socioeconomic effects of discrimination, and racial appeals in political campaigns, to which the Court will not accord significant weight. *See, supra,* Section II.A.3.b.(6). The Court finds that the valid state policies, when weighed against the factors on which Plaintiffs have prevailed, foreclose Plaintiffs' section 2 district line challenge.

The Court therefore finds, for the reasons articulated above, that the interests of the State of Mississippi in maintaining east-west supreme court district lines outweigh the other factors under the totality of the circumstances. Plaintiffs' district line challenge pursuant to section 2 is accordingly dismissed.

## III. Conclusion

The Court finds that Plaintiffs have failed to prove by a preponderance of the evidence any violation of section 2 of the Voting Rights Act of 1965 and that this case, accordingly, should be finally dismissed. A separate judgment will be entered in accordance with Rule 58 of the Federal Rules of Civil Procedure.

SO ORDERED.

APPENDIX 1

COUNTY OUTLINE MAP
OF
**MISSISSIPPI**
CURRENT SUPREME COURT
DISTRICTS AS REAPPORTIONED BY
MISSISSIPPI HOUSE BILL NO.552
April 3, 1987

Miss. Code Ann. § 9-3-1 (Supp. 1987)

APPENDIX 2

CURREN
DISTRICTS BY
MISSISSIP 552
 A.

Miss. Code Ann. § 9-3-1 (Supp. 1987)

APPENDIX 3

MISSISSIPPI